**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

JUSTIN HEINLE, KEVIN W. JOHNSON,
JOSHUA D. JOHNSON, SCOTT MATTIS,
GARRET R. SWINDLER,
BLAKE ULRICH, TERRY M. MILLER,
ESTATE OF MITCH B. MILLER, TERRY M.
MILLER, PERSONAL REPRESENTATIVE,
STAN BLICKENSDERFER, SCOTT &
HEATHER KATUS, MESSER BEAVER
CREEK RANCH G.P., LEONARD KAUFMAN,
FRIED FARM & RANCH LLC, DONNA and
DEVAN LAUFER, BRANDON and
LACY SCHATZ, and CHRISTOPHER CARLSON,
Plaintiffs,

Case No. _____

JURY TRIAL DEMANDED

v.

THE AGRICULTURAL RISK CONSULTING
GROUP, LLC,
D/B/A THE A.R.C. GROUP, LLC, and
JUSTIN LOVEGROVE,
Defendants.

## COMPLAINT

Plaintiffs, by and through their attorneys, bring this Complaint against The Agricultural

Risk Consulting Group, LLC, d/b/a The A.R.C. Group, LLC ("ARC") and its president, Justin

Lovegrove, and in support state as follows:

## INTRODUCTION

1. Plaintiffs are North and South Dakota farmers who contracted with and paid ARC to

provide agricultural risk management consulting services in 2020. These services included advice

on hedging the farmers' crops, using complex contracts known as "hedge-to-arrive" or "HTA"

contracts. HTA contracts refer to a wide variety of hybrid grain contracts that combine some of

the features of a forward cash contract and commodity futures trading.

2.   Plaintiffs' training and experience is in farming, not the commodities markets. None of the Plaintiffs are qualified to, or interested in, devising and implementing their own hedging strategies. They fully entrusted ARC and the representative ARC assigned to their accounts, Angela Runnion, to manage their hedging competently and in good faith so that they could focus on what they knew – farming.

3.   ARC represents and markets itself as a reputable hands-on hedging manager. Its website, for example, states that ARC is "a "commodity consulting firm specializing in managing the risks inherent in production agriculture… Our philosophy is that risk should be managed by creating a consistent strategy to deal with the inevitable uncertainty of today's volatile markets … Our clients rely on us to execute their plan from start to finish."[1] ARC's pitch is that it will manage and reduce farmers' risk – not create additional risk.

4.   Based on their belief that ARC was what it said it was, Plaintiffs each signed Risk Management Consulting Agreements with ARC for ARC to manage their hedging for 2020 (the "Management Contract").

5.   A true and correct copy of Plaintiff Garret Swindler's Management Contract is attached as **Exhibit A**. The remaining Plaintiffs' Management Contracts with ARC were substantively identical to Exhibit A. Although 2020 is the relevant year to this dispute, some Plaintiffs had also entered into Management Contracts with ARC in prior years which also acknowledged ARC's duty to act in good faith.

6.   The Management Contracts require ARC to "in good faith provide consulting services to Client in the area of agricultural marketing" and affirm ARC's liability for gross negligence and willful misconduct.

---

[1] *See* https://agriskconsulting.net/content-about-arc (last viewed October 5, 2021).

7.   Ms. Runnion and her team, on behalf of ARC, mismanaged Plaintiffs' accounts and made a series of material misrepresentations and concealments to Plaintiffs to induce them to enter into trades that resulted in substantial losses. Essentially, rather than managing Plaintiffs' risk as ARC represented it would, Ms. Runnion exposed Plaintiffs to excessive risks, often without authorization altogether or with authorization based on false pretenses.

8.   After ARC fired or forced Ms. Runnion to resign in November, 2020, Defendant Lovegrove, ARC's founder and president, revealed that, contrary to ARC's marketing and prior statements to Plaintiffs, ARC allows representatives like Ms. Runnion to manage customer accounts however they see fit, with minimal to no supervision or accountability. He acknowledged that Ms. Runnion mismanaged client accounts but told Plaintiffs that, because ARC (unbeknownst to Plaintiffs) classified Ms. Runnion as an independent contractor, ARC was not responsible for her actions, and Plaintiffs had no recourse other than to perform on the fraudulent contracts in which she placed them.

9.   After Plaintiffs refused to perform on contracts that were products of Ms. Runnion's fraud, ARC initiated arbitrations against some Plaintiffs, and threatened to do the same against others, before the National Grain and Feed Association ("NGFA"). As discussed below, these claims are not arbitrable for numerous independent reasons.

10. Moreover, ARC's conduct violates the Commodity Exchange Act and constitutes fraud and a breach of ARC's fiduciary and contractual duties to Plaintiffs.

**JURISDICTION AND VENUE**

11. The partners of Messer Beaver Creek Ranch G.P., the members of Fried Farm & Ranch LLC and other Plaintiffs are individual residents and citizens of North Dakota and South Dakota.

3

12. ARC is a Nebraska limited liability company with its principal place of business at 8545 Executive Woods Drive in Lincoln, Nebraska. The members of ARC are Nebraska residents.

13. Mr. Lovegrove is a resident of Lincoln, Nebraska.

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as this case is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S. Code § 1331 and 7 U.S. Code § 25 because this cause of action arises under a federal statute, the Commodity Exchange Act.

15. Venue is proper in this district and division under 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial portion of the activities giving rise to the causes of action occurred in North Dakota including in the counties located in this division as described in D.N.D. Gen. L.R. 1.1. ARC routinely markets its services to farmers located in this district, and it has a place of business in North Dakota. ARC contracted to provide services to Plaintiffs in this district.

16. Ms. Runnion and other ARC representatives visited Plaintiffs at their farms in the vicinity of Bismarck, North Dakota on numerous occasions in connection with ARC's work for Plaintiffs. Ms. Runnion and other ARC representatives conducted business from a location in North Dakota. Moreover, ARC routinely directed telephonic and electronic communications with Plaintiffs to this district in connection with their contracts and business dealings with Plaintiffs. Finally, most of the commodities that ARC contracted to trade for Plaintiffs are located in this district.

17. Mr. Lovegrove's misrepresentations discussed herein were directed to Plaintiffs in North Dakota and intended to induce Plaintiffs to do business with, or continue doing business with, ARC, including pursuant to contracts for commodities located in this district.

**STATEMENT OF FACTS**

18. Plaintiffs contracted with ARC based on ARC's representations that ARC, as a firm, would devise a hedging strategy for Plaintiffs that would limit their risk and then oversee the implementation of that strategy.

19. Through its marketing materials and direct statements to Plaintiffs, ARC led Plaintiffs to believe that Ms. Runnion would implement ARC's strategies for them, that she was supervised by and accountable to ARC, and that trades she placed them in were authorized by ARC.

20. Unbeknownst to Plaintiffs, ARC did not supervise Ms. Runnion and allowed her to manage Plaintiffs' accounts as she saw fit with minimal to no oversight or accountability. Ms. Runnion engaged in both reckless and willful mismanagement of Plaintiffs accounts and made numerous material misrepresentations and concealments to Plaintiffs.

**I.     Ms. Runnion's Misrepresentations to Plaintiffs**

21. For example, on a number of occasions Ms. Runnion represented to Plaintiffs that she was placing them in "paper" trades and that the underlying commodities would never become deliverable because she would liquidate the trades before that occurred. Plaintiffs would never have authorized the trades if they knew that the commodities would become deliverable because Plaintiffs did not have the commodities to deliver. Ms. Runnion, however, failed to liquidate the positions before the commodities became deliverable, leaving Plaintiffs on the hook.

22. Indeed, Ms. Runnion regularly hedged crops far in excess of the quantity that Plaintiffs could produce. She knew full well that Plaintiffs – who engaged ARC to reduce risk, not create it – only intended to hedge a small percentage of their crops but nonetheless disregarded their intentions and created enormous risk.

23. In certain instances, Plaintiffs learned, either through conversations with Ms. Runnion or otherwise, that certain contracts might become deliverable. Plaintiffs would then instruct Ms. Runnion to liquidate those positions, and she would agree to do so, but then she would not do so. Plaintiffs would only find out after the fact when they learned that they were expected to deliver commodities that they did not have.

24. On other occasions, Ms. Runnion represented to Plaintiffs that contracts she sent them to sign were merely duplicates of prior contracts they had already signed that, for some reason or another, they needed to re-sign. In reality, the contracts were entirely new contracts that Plaintiffs had not authorized.

25. On still other occasions, Ms. Runnion entered into contracts on behalf of Plaintiffs without telling them at all. She would only tell them about the contracts after the fact, at times when market conditions appeared favorable. When Plaintiffs would tell her to liquidate unauthorized contracts, she would say she would, and then not follow through.

26. For example, a trade was apparently entered into by Ms. Runnion on August 28, 2020 but intentionally not confirmed to Plaintiffs until October 27, 2020. Ms. Runnion sold Sep 2021 Minneapolis Wheat calls that obligated the farmers to make delivery of quantities of wheat far beyond their intended production if the price exceeded $6.00 per bushel. This trade, rather than reducing risk for the Plaintiffs exposed them to unlimited risk. On the date that ARC confirmed the trade to Plaintiffs, the call options had already incurred a large unrealized loss. By transferring the trade to Plaintiffs, Ms. Runnion and ARC transferred the liability for this loss to unwitting farmers, who had never traded options and did not understand that a fraud was being committed.

27. Additionally, Ms. Runnion, on behalf of ARC, established hedge positions in ARC's futures account and then assigned a portion of these positions to Plaintiffs, after the fact. Ms.

6

Runnion obviously never disclosed this practice to Plaintiffs because she knew no one would ever authorize it. This is the opposite of good faith risk management and belies ARC's representation that its clients' interests were aligned with its own. The Plaintiffs paid ARC to manage their risk – instead, ARC took advantage of the trust the Plaintiffs placed in it to unknowingly enlist them to help ARC offload its own risk.

**II.     ARC's Recorded Admissions of Ms. Runnion's Fraud on Its Behalf**

28. Around November, 2020, Ms. Runnion stopped responding to Plaintiffs' calls and texts. She informed them at some point in November that she had been hospitalized and subsequently declined to render any services to them, or answer any questions or provide any assistance with respect to their accounts at ARC, citing her health.

29. Plaintiffs eventually learned that ARC had terminated its relationship with Ms. Runnion in November, 2020. On information and belief, ARC terminated her due to her mismanagement of Plaintiffs' accounts and those of similarly situated farmers.

30. ARC and Mr. Lovegrove have admitted to various Plaintiffs that Ms. Runnion mismanaged client accounts and made ill-advised trading decisions. One plaintiff, Kevin Johnson, recorded two such calls, transcripts of which are attached as **Exhibits B** and **C**.

31. On information and belief, ARC is in possession of recordings of calls between Lovegrove and/or other ARC officials and other Plaintiffs that took place following Runnion's separation from ARC.

32. ARC's affiliate, ARC Trading LLC, is registered with the US Commodity Futures Trading Commission ("CFTC") as an introducing broker, and it is a member of the National Futures Association ("NFA"). ARC and ARC Trading LLC share a common telephone number and office address.  Mr. Lovegrove is registered with the CFTC as an associated person of ARC Trading

LLC. Ms. Runnion was registered with the CFTC as an associated person and branch office manager of ARC Trading LLC from December 2014 until November 2020.

33. On information and belief, ARC has a policy to record its telephone calls with its clients in order to comply with NFA rules. In connection with pending arbitration cases, ARC has refused to produce copies of its telephone recordings.

34. Mr. Lovegrove's admissions during the calls recorded by Kevin Johnson are too numerous to list but some examples follow:

  a. In discussing Ms. Runnion's (in his words) "crazy" practices, Mr. Lovegrove said: "Risk management is not just selling a blind call. I agree. We would never recommend it. If we ever recommend it, I want you to drive down to Lincoln and kick us." **Ex. C**, Transcript. p. 42.

  b. "My -- my thought on that is, in exchange for that, you're completely ·handcuffed.· I just don't think she did a good job of explaining the risk of selling those calls to her client."· **Ex. B** p. 39 at 25 and p. 40 at 1-4.

  c. And that's -- that's -- ·I just want to be clear with everybody, that's ·nothing we would ever recommend (referring to trades Ms. Runnion recommended). **Ex B** p. 42 at 20-22.

  d. "my radar went off when I found these trades of Angie's like ---·whoa, whoa, whoa.· That's crazy." **Ex. B** p. 44 at 10-12.

  e. "I do think there was some stuff that was probably some wool pulled over people's eyes and not explained super clearly; and I can tell you our job at ARC Group is to explain things clearly to you." **Ex. C, p. 12**.

    f.   Additional examples include: **Ex. C**, p. 14 (Mr. Lovegrove agreeing that Ms. Runnion's conduct was "malpractice" and "a failure of this entire program."); **Ex. C** p. 25 (Mr. Lovegrove admitting that Ms. Runnion "lie[d]" to farmers that ARC changed policies to get them to sign contracts); **Ex. C**, p. 23-24 (Ms. Runnion's subordinate, Ms. Jacobson, admitting that Ms. Runnion added adverse terms to contracts and then, to ensure farmers would not read the contracts before signing them, Ms. Runnion demanded that "nothing was ever sent to you guys" and asked her to instead "go to meet with these guys, we'll print out these contracts and then they'll just initial them."); **Ex. B**, p. 40 (Ms. Jacobson admitting risky calls were sold because "they [farmers] don't necessarily know any better."); **Ex. B** p. 41 (Mr. Lovegrove admitting Ms. Runnion repapered call trades to make them look current: "so now on two years ago wheat, she's handcuffing you on next year's wheat.").

35. Mr. Lovegrove was willing to be candid about Ms. Runnion's misconduct because, during the same calls, he attempted to convince the Plaintiffs that ARC bore no responsibility for her actions because she was an independent contractor.  Mr. Lovegrove falsely told various Plaintiffs that, because ARC internally classified Ms. Runnion as an independent contractor, ARC was not responsible for her actions as a matter of law. Plaintiffs, he claimed, had no recourse and needed to perform on the contracts Ms. Runnion had placed them in, whether fraudulent or not.

36. He further told various Plaintiffs that, as an independent contractor, Ms. Runnion had been free all along to manage their accounts however she saw fit, and that ARC did not train, supervise or control her, allowing her to engage in conduct ARC itself would "never recommend."

37. For example, in a recorded call with Mr. Johnson, Mr. Lovegrove said, in relevant part:

Anyway, the way our office works is we have independent contractors around the country and it's up to them how they run their business so I give a recommendation I give a couple of recommendations it's their own businesses that they are running."

"And Angela [Runnion ] or Christina [Jacobson] now with us can send them out saying this is Justin's recommendation and tell me if you have any questions. But the independent contractors have their own choice.  If they want to follow their own plan, do their own thing, or follow mine. That's part of being an independent contractor. If they were employees, they would like everybody gets in line and does what I say that's what they would do by me but as I said they are independent contractors so they do their own thing."

*See* **Ex. C**, pp. 3-5.

38. Notwithstanding Lovegrove's statements, ARC now admits in its arbitration filings that Ms. Runnion – who repeatedly contracted with Plaintiffs in ARC's name using ARC's stationery – was its agent at all relevant times, regardless of her tax classification.

39. Presumably, ARC realized at some point that throwing Ms. Runnion under the bus cuts both ways – *i.e*., ARC could not simultaneously deny that Ms. Runnion was its agent when she placed the farmers in fraudulent contracts while also seeking to recover damages in arbitrations under the same contracts.

40. Now that ARC admits Ms. Runnion was its agent, all of Ms. Runnion's "crazy" recommendations, which ARC said were "nothing we would ever recommend," were actually ARC's recommendations all along.

41. Nonetheless, despite telling Mr. Johnson "if we ever recommend [the trades Runnion recommended], I want you to drive down to Lincoln and kick us," ARC somehow believes it can deny liability for its agent's conduct and recover on her fraudulent contracts.

### III.     ARC Admits that Its Marketing Materials Were Full of Lies

42. In the course of attempting to dissuade the farmers from taking legal action by falsely telling them Ms. Runnion was not ARC's agent, Mr. Lovegrove admitted ARC's marketing and

promotional materials regarding the company's culture, values, philosophy and track record were absolutely false. Ms. Runnion was free to do whatever she wanted with Plaintiffs' accounts while using ARC's name to lend herself false credibility.

43. In fact, Mr. Lovegrove's statements directly contradict ARC's marketing brochure – provided to Plaintiffs prior to contracting with ARC – which brags that "our success is based on a sound and disciplined plan consistent across the entire company" and that "we are completely aligned with your best interests."

44. A true and correct copy of the marketing brochure is attached as **Exhibit D.**

45. It also contradicts statements on ARC's website including that "[o]ur clients rely on us to execute their plan from start to finish." Plaintiffs took the website and similar representations at face value and believed they were relying on ARC – an established and experienced firm (or so they thought) – not on some rogue individual who answered to no one. A printout of the website is attached as **Exhibit E**.

46. Plaintiffs believed, based on ARC's representations, that ARC had a time-tested culture, philosophy, and methodology and would supervise its representative to ensure that the management of their accounts met ARC's high standards. They expected that ARC would trade in small increments and avoid aggressive and risky trading.

47. No one from ARC ever told Plaintiffs when they began working with Ms. Runnion, or at any time before ARC terminated Ms. Runnion, that Ms. Runnion was an independent contractor or that, as a result of that status, ARC believed it was not responsible for her actions.

48. Instead, ARC held Ms. Runnion out, and Ms. Runnion held herself out, as an agent and representative of ARC charged with implementing ARC's strategies for their accounts. Tellingly, the contracts in which Ms. Runnion placed Plaintiffs were on ARC stationery, not her own, and

Plaintiffs had every reason to believe ARC was aware of and approved the contracts, since she executed the contracts on behalf of ARC. In addition, on information and belief, ARC placed trades in its own futures account to hedge the contracts submitted to ARC by Ms. Runnion.

### IV.     Plaintiffs Refuse to Perform on Fraudulent Contracts and ARC Files Arbitrations

49. ARC's breaches of its Management Contract and the Commodity Exchange Act, further discussed below, invalidate all of ARC's contracts with Plaintiffs regardless of whether the individual contract was fraudulent. Plaintiffs have nonetheless performed under numerous contracts with ARC that were not facially fraudulent on their own.

50.  Plaintiffs, however, have refused to deliver on contracts that they either never authorized or that Ms. Runnion fraudulently induced them to authorize. Further, after ARC made clear that it would not take responsibility for its agent's fraud, Plaintiffs declined to deliver on other pending contracts because (a) ARC would likely offset any proceeds to the fraudulent contracts and then still attempt to collect on the others, and (b) in light of the legal issues ARC was likely to face as a result of Ms. Runnion's fraud Plaintiffs doubted ARC's ability to remain solvent.

51.  Some Plaintiffs, including Mr. Mattis, expressed their concerns about ARC's solvency to ARC and ARC did not dispute that the concerns were legitimate, instead proposing that he perform in increments in order to minimize his loss if ARC could not pay.

52. As a result, ARC has filed arbitrations with the National Grain and Feed Association against Plaintiffs Justin Heinle, Kevin Johnson, Garret Swindler, Scott Mattis, and Scott and Heather Katus alleging that they are in default on the contracts they repudiated due to Ms. Runnion's fraud.

53. The arbitrations ARC has filed against the above-referenced Plaintiffs seek between $200,000.00 and $900,000.00 in damages.

54. A true and correct copy of those arbitration complaints is attached hereto as **Group Exhibit F.**

55. The Plaintiffs against which ARC has filed arbitrations have each filed objections to arbitrating before the NGFA which are attached hereto as **Group Exhibit G**.

56. ARC has threatened to file arbitrations against the remaining Plaintiffs that are similar in substance to the complaints included in Ex. F.

57. The remaining Plaintiffs expect, based on the value of the disputed contracts and demand letters ARC has sent them, that ARC will claim damages in excess of $75,000 in any proceeding against them.

### V.     ARC's Claims are Not Arbitrable

58. ARC contends that its claims are arbitrable because trade confirmations ARC sent to Plaintiff contained the following language (the "Arbitration Clause"):

> *Unless otherwise provided herein, this Contract shall be subject to the Trade Rules of the National Grain and Feed Association (NGFA), which are incorporated herein by reference. The parties agree that the sole forum for resolution of all disagreements or disputes between the parties in any way arising under or related to this Contract or the formation of this Contract shall be by arbitration proceeding before the NGFA and under NGFA Arbitration rules. Arbitration must occur in Lancaster County, Nebraska.*

59. One of the trade confirmations containing the Arbitration Clause is attached as **Exhibit H** as an example. The remaining trade confirmations are substantively identical to Exhibit H.

60. By (a) invoking the rules of the NGFA, and (b) purporting to require arbitration before the NGFA, the trade confirmations left the impression that ARC was a member of the NGFA. Not only did this falsely imply that ARC was entitled to arbitrate before the NGFA, it also lent ARC false credibility as a purported member in good standing of a trusted industry association.

61. At the time ARC sent Plaintiff the confirmations at issue, ARC was not a member of the NGFA and therefore had no right to arbitrate disputes in that forum or to require others to submit to arbitration there.

62. ARC first became a member of NGFA on or about March 1, 2021.

63. ARC joined the NGFA only after it learned that, as a non-member of the NGFA, it could not avail itself of the NGFA's arbitration forum to pursue its claims against Plaintiffs.

64. On information and belief, ARC hoped that its after-the-fact membership would allow it to invoke the Arbitration Clause and avoid litigating in court, where discovery would further expose its fraud against Plaintiffs.

65. Despite ARC's untimely efforts, guidance that was published in the NGFA's FAQ responses at the time ARC joined the NGFA makes clear that, for a dispute to be eligible for arbitration before the NGFA, at least one party to the arbitration must have been a member of the NGFA at the time the dispute arose.

66. A true and correct copy of the NGFA guidance is attached as **Exhibit I**.

67. NGFA changed its guidance, effective October 1, 2021, to require that at least one party be a member of the NGFA at the time the arbitration agreement was entered into in order for a dispute to be eligible for arbitration.

68. A true and correct copy of the revised guidance is attached as **Exhibit J.**

69. All of Plaintiffs' arbitration agreements with ARC predated March, 2021, when ARC finally joined the NGFA.

70. Moreover, Plaintiffs' disputes with ARC had already arisen before ARC joined the NGFA because Plaintiffs and their attorneys had repeatedly made ARC aware of their objections to Ms.

Runnion's fraudulent trades on their behalf. ARC knew that Plaintiffs had no intention to perform any purported obligations with respect to fraudulent contracts.

71. ARC filed its arbitrations knowing that the NGFA guidances attached as Exs. I and J prohibit them from arbitrating their claims. ARC cannot claim a good faith misunderstanding of Ex. I as permitting arbitration when it filed its latest arbitration, against Scott and Heather Katus, in January, 2022, long after Ex. J clarified in no uncertain terms that ARC would have needed to be a member at the time of the contracts at issue.

72. Both contracts at issue in the Katus arbitration are from 2020. ARC, again, first became a NGFA member on or about March 1, 2021 and certainly not in 2020.

73. It is apparent that ARC is attempting to sneak its claims into arbitration without basis in defiance of the NGFA's own guidances. Presumably, ARC is taking this approach because it does not want (a) to have to respond to discovery, and (b) for its fraud and other misconduct described herein to be presented to a judge or jury.

74. Putting aside the NGFA's guidance, the purported arbitration agreements are illusory, one-sided and therefore unenforceable under applicable law. No agreement to arbitrate could have formed when the parties were unable to exercise their rights under the contract.

75. For example, had one of the Plaintiffs wanted to initiate an arbitration under the purported arbitration agreement based on ARC's actions, they would not have been able to do so because neither they nor ARC would have been members of the NGFA when the dispute arose.

76. If ARC's after-the-fact membership permitted arbitration then ARC could enter into arbitration agreements that are invalid at the time they are executed and reserve itself the right to unilaterally "activate" the agreement when it wants to file an arbitration.

77. As such, even assuming a contract to arbitrate had ever formed between Plaintiffs and Defendant, the agreements would be unconscionable and invalid as a matter of law.

78. The agreements also fail for lack of consideration and mutuality. If ARC has its way it would be able to retroactively activate the arbitration agreement, at a time of its choosing, by joining the NGFA, so that only ARC, and not Plaintiffs, could invoke the arbitration agreement and file a claim in this forum. Plaintiffs would have no right to initiate an arbitration before the NGFA whereas ARC would reserve itself the right to choose whether to join, and arbitrate before, the NGFA, or to pursue relief elsewhere.

79. Separately, Plaintiffs' Management Contracts did not contain arbitration provisions. Plaintiffs agreed to pay, and paid, ARC its fee pursuant to the one page Management Contract, not later trade confirmations with inconspicuous terms and conditions.

80. Each Plaintiff's Management Contract predated the trade confirmations containing the Arbitration Clauses. Indeed, the trade confirmations were issued pursuant to the Management Contracts from which ARC derived its authority to recommend and execute trades for Plaintiffs.

81. ARC, however, did not inform Plaintiffs of any obligation to arbitrate at the time when Plaintiffs executed their Management Contracts and paid ARC's fee. Instead, ARC inserted its Arbitration Clause after the fact trade confirmations that Plaintiffs did not see until after they had engaged ARC.

82. At that point, Plaintiffs' choice was either to execute the Trade Confirmations or to effectively render the Management Contract useless (because ARC would not proceed with any of the trades it recommended for Plaintiffs without a trade confirmation) and forfeit the fees they had paid ARC.

83. ARC's tactics render the Arbitration Clause invalid and/or unenforceable due to, among other things, duress and unconscionability.

84. Further, the arbitration agreements are void for lack of consideration because Plaintiffs had already paid ARC's management fee before signing the arbitration agreement. ARC did not perform any services for Plaintiffs aside from recommending and executing trades on their behalf but conditioned performance of those services (after Plaintiffs had already paid for them) on execution of an arbitration agreement.

85. Moreover, as Plaintiffs' fiduciary, ARC was obligated not to slip terms that were adverse to Plaintiffs into routine trade confirmations especially when ARC did not call them to Plaintiffs' attention.

86. Instead, ARC included the Arbitration Clause in an inconspicuous "additional terms and conditions" page of the trade confirmations. Rather than informing Plaintiffs of the clause, ARC had them electronically sign the trade confirmation through software that did not bring the arbitration clause, or any other adverse terms, to Plaintiffs' attention. ARC knew that the Plaintiffs were farmers, not lawyers, and that none of them were represented by counsel with respect to the trade confirmations.

87. Ms. Runnion and ARC never advised Plaintiffs that confirmations of individual trades contained material terms, adverse to Plaintiffs, that materially changed their relationships with ARC. Instead, ARC presented the trade confirmations as insignificant routine paperwork that Plaintiffs should quickly sign (electronically) and return.

88. Indeed, ARC's e-signature software generated confirmations showing that, in many instances, only seconds or minutes passed between the time when Plaintiffs opened the trade

confirmations and the time when Plaintiffs electronically signed them. ARC, despite its fiduciary duties, still did not direct Plaintiffs to review the adverse terms and conditions.

89. The arbitration agreement is also unenforceable under the doctrine of impossibility because it mandates that arbitration "must occur in Lancaster County, Nebraska." The NGFA does not have an office in Lancaster County, Nebraska and it administers its arbitration program from its offices in Arlington, Virginia. ARC cannot contractually require the NGFA to hold an arbitration hearing in a location of its choosing. Thus, the agreement is contingent on a condition precedent that cannot occur.

90. Finally, even if ARC's contract claims were arbitrable (they are not), Plaintiffs' claims for breach of fiduciary duty asserted herein, as well as the claims under the Commodity Exchange Act, are not arbitrable because they do not arise under or relate to the trade confirmations containing the arbitration clause.

## COUNT I – DECLARATORY JUDGMENT

91. Plaintiffs incorporate and reallege Paragraphs 1 through 87 hereof as though fully restated herein.

92. ARC has filed arbitrations against certain Plaintiffs and made clear its intentions to file arbitrations against the others during conversations with them and/or their counsel. ARC contends that its Arbitration Clauses are valid and enforceable.

93. Plaintiffs, for the above-stated reasons, believe the disputes are not arbitrable and that the Arbitration Clauses are invalid and unenforceable.

94. Moreover, ARC contends that Plaintiffs are liable under all contracts in which Ms. Runnion placed them regardless of Ms. Runnion's fraud, bad faith and mismanagement on ARC's behalf. Plaintiffs contend they are not required to honor fraudulent contracts.

95. An actual controversy exists regarding whether ARC's claims against Plaintiffs are arbitrable before the NGFA.

96. The controversy between the parties is definite and concrete, real and substantial, and relates to the parties' adverse legal interests.

### COUNT II – BREACH OF FIDUCIARY DUTY AGAINST ARC

97. Plaintiffs incorporate and reallege Paragraphs 1 through 93 hereof as though fully restated herein.

98. Due to ARC's sophistication and its superior knowledge of hedging, and because of the trust Plaintiffs placed in ARC, ARC owed Plaintiffs fiduciary duties including to exercise care, and act in good faith, in managing Plaintiffs' hedging and in its business dealings with Plaintiffs.

99. ARC's website admits it owes its clients, like Plaintiffs, fiduciary duties: "Our clients rely on us to execute their plan from start to finish."

100. Moreover, its marketing brochure, attached as Ex. D, reassures potential clients like Plaintiffs that "We are completely aligned with your best interests."

101. ARC breached its fiduciary duties to Plaintiffs through the negligence and intentional misconduct described above, including, without limitation, failing to liquidate positions before they became deliverable, misrepresenting to Plaintiffs that trades were "paper" trades, misrepresenting to Plaintiffs that they were being asked to re-authorize old 2020 trades when in fact ARC was placing them in new 2021 trades, and entering contracts on Plaintiffs' behalf without their consent or authorization.

102. ARC also breached its fiduciary duties to Plaintiffs when Mr. Lovegrove falsely represented to Plaintiff that, because Ms. Runnion was an independent contractor, Plaintiffs, and not ARC, were responsible for her fraudulent trades and Plaintiffs had no recourse against ARC.

103.     Additionally, ARC breached its fiduciary duties to Plaintiffs when, after entering into a one page Management Contract with them that Plaintiffs believed governed their relationship with ARC (and under which ARC contracted to act in good faith), ARC slipped terms adverse to Plaintiffs into inconspicuous "terms and conditions" included with individual trade confirmations.

104.     ARC's mere inclusion of these terms was a breach of its fiduciary duties on its own but ARC compounded its breach by presenting the trade confirmations to Plaintiffs as routine paperwork and not warning them that the confirmations actually included materially adverse terms, despite ARC knowing that Plaintiffs could not possibly have read the terms in their entirety, let alone consulted with legal counsel, based on the timing of their signatures.

105.     Plaintiffs suffered damages as a result of Ms. Runnion's misrepresentations and mismanagement of their accounts. For example, they were placed in ill-advised trades they either did not authorize or authorized based on misrepresentations, resulting in losses. Ms. Runnion's failure to liquidate Plaintiffs' positions before they became deliverable, in violation of ARC's duty of care, also resulted in losses which Plaintiffs had to cover after Mr. Lovegrove falsely informed them that they had no other recourse.

**COUNT III – BREACH OF FIDUCIARY DUTY AGAINST LOVEGROVE**

106.     Plaintiffs incorporate and reallege Paragraphs 1 through 102 hereof as though fully restated herein.

107.     Plaintiffs entrusted Mr. Lovegrove, as ARC's founder and president, to ensure that ARC and its representatives exercised reasonable care and acted in good faith with respect to their accounts and hedging strategies.

108.     When Plaintiffs spoke to Mr. Lovegrove after Ms. Runnion's termination they entrusted him to provide honest advice regarding their options in light of Ms. Runnion's actions.

109.     Mr. Lovegrove breached his fiduciary duties to Plaintiffs when, notwithstanding ARC's prior representations and promotional materials (which, on information and belief, he reviewed and approved), he failed to supervise or cause ARC to supervise Ms. Runnion or to exercise reasonable care that she acted in good faith and in Plaintiff's interests.

110.     He further breached his fiduciary duties to Plaintiffs when he falsely told them, in order to protect ARC's interests at their expense, that ARC was not responsible for Ms. Runnion's actions as an independent contractor and that they had no choice but to perform on Ms. Runnion's fraudulent contracts.

111.     Plaintiffs were damaged as a result of Mr. Lovegrove's breaches.

## COUNT IV - FRAUD AND DECEIT AGAINST ARC

112.     Plaintiffs incorporate and reallege Paragraphs 1 through 108 hereof as though fully restated herein.

113.     ARC knowingly made numerous material misrepresentations and concealments to Plaintiffs with the intention that Plaintiffs would rely on them.

114.     Some examples include:

a.   ARC's misrepresentations that ARC had trained Ms. Runnion, and would supervise and be accountable for Ms. Runnion's conduct, to induce Plaintiffs to contract with ARC, while concealing that ARC actually allowed independent contractor representatives like Ms. Runnion to manage client accounts as they saw fit with minimal to no supervision or oversight.

b.   ARC's misrepresentations on its website and in its marketing materials that, for example, it states, "our clients rely on us to execute their plan from start to finish," when, in fact, ARC handed off clients to unqualified independent contractors who it did not supervise, oversee or otherwise hold accountable.

c.   Ms. Runnion's misrepresentations that trades in which she placed Plaintiff were "paper trades" and that she would liquidate them before they became deliverable in order to induce Plaintiffs to authorize the trades and, on information and belief, generate commissions for ARC and/or Ms. Runnion.

d.   Ms. Runnion's representations that she had, in fact, liquidated trades so that they would not become deliverable when she had not done so, to induce Plaintiffs to unknowingly remain in the trades and, on information and belief, generate commissions for ARC and/or Ms. Runnion.

e.   Ms. Runnion's representations that trade confirmations she sent Plaintiffs were to reauthorize previously authorized 2020 trades when in fact they were for new, unauthorized 2021 trades, in order to induce Plaintiffs to authorize the trades and, on information and belief, generate commissions for ARC and/or Ms. Runnion.

f.   Mr. Lovegrove's representations that, because Ms. Runnion was an independent contractor, ARC was not responsible for her conduct and Plaintiffs had no recourse other than to perform on fraudulent contracts.

115.    Plaintiffs believed ARC's misrepresentations and were unaware of the information that ARC concealed. Accordingly, Plaintiffs relied on ARC's misrepresentations and concealments, including in agreeing to do business with, and continuing to transact with, ARC.

116.    Especially in light of the parties' fiduciary relationship, Plaintiffs were entitled to rely on ARC's representations and their reliance was reasonable.

117.    Plaintiffs were damaged as a result of ARC's fraud.

118.    To the extent that ARC's misrepresentations and concealments discussed above do not constitute fraud because they did not relate to the parties' contracts, alternatively, they constituted deceit and Plaintiffs are entitled to recover the same damages.

### COUNT V – FRAUD AND DECEIT AGAINST LOVEGROVE

119.    Plaintiffs incorporate and reallege Paragraphs 1 through 115 hereof as though fully restated herein.

120.    Mr. Lovegrove, personally and through ARC marketing and promotional materials that he, on information and belief, reviewed and approved, misrepresented to Plaintiffs that ARC

would develop and implement hedging strategies for Plaintiffs and act in Plaintiff's best interests. He led Plaintiffs to believe that, by working with ARC, they would receive the benefit of ARC's institutional knowledge, experience, and good name.

121.     Mr. Lovegrove made these representations to induce Plaintiffs to contract and do business with ARC, all the while planning to hand their accounts off to a representative who ARC did not adequately train or supervise. He never told Plaintiffs that Ms. Runnion was an independent contractor or that he purportedly believed that status absolved ARC of any responsibility for her actions with respect to Plaintiffs' accounts.

122.     Then, after Ms. Runnion's fraud, Mr. Lovegrove falsely told Plaintiffs that, because Ms. Runnion was an independent contractor, ARC bore no responsibility for her fraud relating to their contracts and they had no recourse. Mr. Lovegrove could not have believed that to be the case when Ms. Runnion contracted as an agent of ARC, in ARC's name, and on ARC stationery.

123.     Mr. Lovegrove made these recommendations to induce Plaintiffs to pay the amounts ARC claimed were due on Ms. Runnion's fraudulent contracts.

124.     Plaintiffs reasonably relied on Mr. Lovegrove's representations and concealments and were damaged as a result.

125.     To the extent that Mr. Lovegrove's misrepresentations and concealments discussed above do not constitute fraud because they did not relate to the parties' contracts, alternatively, they constituted deceit and Plaintiffs are entitled to recover the same damages.

## COUNT VI – BREACH OF CONTRACT

126.     Plaintiffs incorporate and reallege Paragraphs 1 through 122 hereof as though fully restated herein.

127.     ARC contracted, in its Management Contract, to "in good faith provide consulting services to Client in the area of agricultural marketing."

128.     The Management Contract is a valid and enforceable contract. Plaintiffs performed their obligations under the Management Contract.

129.     ARC's above described actions are the opposite of good faith conduct. ARC therefore breached the express terms of the Management Contract as well as the covenant of good faith and fair dealing implied in every contractual relationship including the Management Contract and every individual Trade Confirmation between Plaintiffs and ARC

130.     Plaintiffs were damaged as a result of ARC's breaches.

### COUNT VII – VIOLATIONS OF THE COMMODITY EXCHANGE ACT

131.     Plaintiffs incorporate and reallege Paragraphs 1 through 127 hereof as though fully restated herein.

132.     As discussed above, ARC placed Plaintiffs in commodity futures and options contracts contemplating volumes that ARC knew Plaintiffs could not realistically deliver.

133.     ARC assured Plaintiffs that they need not be concerned about such contracts because they were "paper trades" that ARC would liquidate before they became deliverable.

134.     Such contracts constitute illegal off-exchange commodities contracts in violation of the Commodity Exchange Act ("CEA"), 7 USC § 6, because futures contracts (including options on futures) must be traded on a regulated exchange. Since the contracts were entered into in violation of the Commodity Exchange Act, the contracts are unenforceable.

135.     The Commodity Futures Trading Commission ("CFTC") has been clear that actual delivery of an agricultural commodity needs to be contemplated by both parties in order for a

contract to be considered a forward contract excluded from regulation as a futures contract under the CEA.

136.     Courts look beyond the face of the contract to determine whether actual delivery is contemplated and examine indicators of party intent, including whether the parties are capable of delivering or receiving the commodity in the quantities provided for in the contract.

137.     Here, the contract quantities exceeded Plaintiffs' production available for delivery (especially in light of other contracts for delivery of the same commodities in which ARC hard placed them).

138.     ARC told Plaintiffs it would liquidate the contracts before delivery and Plaintiffs believed ARC's representations.

139.     ARC defrauded and misled Plaintiffs with respect to these unlawful contracts including by representing that they were "paper trades" that would not become deliverable.

140.     Accordingly, the contracts violated the CEA because they were futures contracts not conducted on or subject to the rules of a board of trade and were designed to defraud and deceive Plaintiffs. 7 U.S.C. § 6b(a)(2)(A).

141.     In addition, ARC, through its agents Ms. Runnion, Mr. Lovegrove and others, was acting as a commodity trading advisor, as defined in 7 U.S.C. § 1a(12), by, for compensation or profit, engaging in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in one or more contracts of sale of a commodity for future delivery.

142.     Under 7 U.S.C. § 6o, it is unlawful for a commodity trading advisor "to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant;

or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

143.     As further alleged in Counts IV and V, Defendants defrauded Plaintiffs and are liable for this fraud under 7 U.S.C. § 6o.

## COUNT VIII – CONSTRUCTIVE FRAUD

144.     Plaintiffs incorporate and reallege Paragraphs 1 through 140 hereof as though fully restated herein.

145.     Through their above-described breaches of fiduciary duty, Defendants gained an advantage by misleading Plaintiffs to their detriment.

146.     Defendants' misrepresentations and concealments of material facts from Plaintiffs, which they were bound in good faith to disclose, constitute constructive fraud.

WHEREFORE, Plaintiffs request that the Court award the following relief:

    a.  A declaration that ARC's purported claims against Plaintiffs are not arbitrable before the NGFA;

    b.  A declaration that the contracts ARC seeks to enforce against Plaintiffs are unenforceable due to ARC's above-described unlawful conduct;

    c.  An award of monetary damages in favor of each Plaintiff in an amount to be determined at trial in excess of $75,000;

    d.  An award of punitive damages in an amount to be determined at trial;

    e.  All other damages available under the Commodity Exchange Act;

    f.  An award of reasonable attorney's fees and costs; and

    g.  Such other relief as the Court deems just and appropriate

Dated: March 8, 2022

**ATTORNEYS FOR PLAINTIFFS:**

/s/ David C. Barrett, Jr.
David C. Barrett, Jr.
Barrett, Easterday,
Cunningham & Eselgroth, LLP
P.O. Box 7221
Bismarck, ND 58507-7221
701-354-4878
dbarrett@farmlawyers.com

/s/ William J. Bolotin
William J. Bolotin
Funkhouser Vegosen Liebman & Dunn Ltd.
55 West Monroe Street, Suite 2300
Chicago, IL 60603
312-701-6880
wbolotin@fvldlaw.com

/s/ G. Eli Earich
G. Eli Earich
Barrett, Easterday,
Cunningham & Eselgroth LLP
7259 Sawmill Road
Dublin OH 43016
614-210-1840
gearich@farmlawyers.com

Gary M. Sinclair*
2043 N. Mohawk Street
Chicago, IL 60614
773-871-4389
gary@garyslaw.com

Seth A. Stern*
Funkhouser Vegosen Liebman & Dunn Ltd.
55 West Monroe Street, Suite 2300
Chicago, IL 60603
312-701-6837
sstern@fvldlaw.com

*Applications for admission in process for
attorneys Sinclair and Stern.